FILED

2005 Sep-20  PM 03:08
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| SAMUEL MOORE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CIVIL ACTION NO. 02-PWG-2692-S |
| | ) |
| ITT TECHNICAL INSTITUTE, | ) |
| | ) |
| Defendant. | ) |

| | |
|---|---|
| STEPHEN HOBBS, BARRY JEFFERSON, | ) |
| WEENA JONES, KIMBERLY McTYER, | ) |
| CARRIE MOORE AND CHELAVONNE | ) |
| SINGLETON, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) CIVIL ACTION NO. 03-PWG-0708-S |
| | ) |
| ITT TECHNICAL INSTITUTE, | ) |
| | ) |
| Defendant. | ) |

MEMORANDUM OF OPINION

Plaintiff Kimberly McTyer, an African American female, filed this action against the defendant, ITT Technical Institute, alleging race discrimination in employment in violation of Title VII and 42 U.S.C. § 1981. Specifically, she alleges that she was racially discriminated against in training, lead assignments, evaluations, write-ups, pay and termination. She also alleges that she was sexually harassed. She seeks injunctive relief, back pay, punitive and compensatory damages, and nominal damages.

The parties have consented to the jurisdiction of the magistrate judge pursuant to 28 U.S.C. § 636(c) and LR 73.2.

This case is before the court on ITT's Motion for Summary Judgment. (Doc. # 26).

Summary judgment is appropriate only if there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law.  Rule 56, *Federal Rules of Civil Procedure*.  In making that assessment, the court must view the evidence in a light most favorable to the non-moving party and must draw all reasonable inferences against the moving party.  *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).  The burden of proof is upon the moving party to establish his prima facie entitlement to summary judgment by showing the absence of genuine issues and that he is due to prevail as a matter of law.  *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604 (11th Cir. 1991).  Once that initial burden has been carried, however, the non-moving party may not merely rest upon his pleading, but must come forward with evidence supporting each essential element of his claim.  *See Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986); *Barfield v. Brierton*, 883 F.2d 923 (11th Cir. 1989).  Unless the plaintiff, who carries the ultimate burden of proving his action, is able to show some evidence with respect to each element of his claim, all other issues of fact become immaterial and the moving party is entitled to judgment as a matter of law.  *See Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Bennett v. Parker*, 898 F.2d 1530 (11th Cir. 1990).  As the Eleventh Circuit has explained:

> Facts in dispute cease to be "material" facts when the plaintiff fails to establish a prima facie case. "In such a situation, there can be `no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial." [Citation omitted].  Thus, under such

2

> circumstances, the public official is entitled to judgment as a matter of law, because the plaintiff has failed to carry the burden of proof. This rule facilitates the dismissal of factually unsupported claims prior to trial.

898 F.2d at 1532.

The following pertinent  facts are undisputed or, if disputed, viewed in the light most favorable to McTyer, the nonmoving party.

ITT is a private college system focused on technology-oriented programs of study operating over 70 ITT Technical Institutes in 28 states.  The 1999 version of ITT's Handbook, which is provided to each ITT employee, contains ITT's Equal Employment Opportunity policy which provides, in part, "Employment selection and related decisions are made without regard to race, [...] sex [...] or any other reason prohibited by law."  ITT also distributes its freestanding Anti-Harassment and Anti-Discrimination Guidelines to all ITT employees.  ITT's policy prohibiting harassment and discrimination is also displayed at the Birmingham campus in the employee break room.

 McTyer and Barry Jefferson were both hired as outside representatives effective February 12, 2001.  Outside representatives are responsible for recruiting, interviewing, enrolling, and starting high school students as ITT students.  Stephen Hobbs and Steve Litvine were the other outside representatives at the time that McTyer and Jefferson were hired.  Director of Recruitment (DOR) Benjamin Reeves, a white male, interviewed McTyer for employment at ITT.  McTyer contends she was not properly trained by Reeves.  McTyer and Jefferson were the only representatives hired while Reeves was DOR and Reeves did not train any white employees.

3

According to plaintiff Hobbs, his training for the outside representative position under Reeves' predecessor included watching videos, touring the school and watching other representatives make presentations and perform their job.  Reeves provided McTyer and Jefferson with a training script and told them to read it.  Reeves also had McTyer help him prepare a phone script.

Reeves provided Jefferson and McTyer older leads for them to practice their presentation technique.  McTyer and Jefferson watched videos and went over company policy.  McTyer observed Hobbs and Litvine making presentations to prospective students.  McTyer was also provided a tour of ITT's Birmingham campus.  The Representative Training Agenda lists the training that each new representative is expected to receive.  McTyer and Jefferson were the first two representatives that Reeves was responsible for training, and Reeves did not know that the Representative Training Agenda was to be completed contemporaneous with the training until he attended DOR training in mid to late April 2001.

Reeves completed the Representative Training Agendas when Rice requested the agendas in April 2001.  According to Reeves, he made an "honest" and "conscientious" attempt to reconstruct the dates that the training had been conducted.  Reeves told Jefferson and McTyer that he was bogged down with Exeter (ITT's computer system) and trying to learn the DOR job.  According to McTyer, Reeves never trained anyone because "[h]e just didn't know what to do" and did not have enough knowledge to train her.  McTyer believes Reeves was not capable of training her but stated this had nothing to do with race.

On April 24, 2001 McTyer presented a letter to Regional Director Hendrickson complaining that she felt she had not been properly trained.  McTyer wanted Hendrickson to see that she was trained properly.  McTyer and Jefferson were sent to ITT's Jacksonville, Florida campus for two and

4

a half days of additional training.  McTyer and Jefferson are the only representatives ever sent from ITT's Birmingham campus to another ITT facility for training.

During the Summer 2001 McTyer and other representatives met with Hendrickson to discuss Reeves' performance.  Shortly thereafter Reeves was relieved of the DOR responsibility.  Ruffin, an African-American, was promoted to the DOR position effective September 1, 2001.  Ruffin provided review training to McTyer, including sales role playing, phone prospecting and interviews.  According to McTyer, Ruffin spent a lot of time with Meredith Rowlen, white female, and Lakeya Tuck, African-American female, two new inside representatives who were hired effective January 28, 2002 and April 8, 2002, respectively.  McTyer complains that Rowlen and Lakeya Tuck received more favorable training than her but acknowledges they were trained by a different DOR than she was.

Ruffin told the representatives in an open meeting that they (ITT and Rice) were going to "gut" the recruiting staff, meaning that ITT would reduce the recruiting staff if the college did not start achieving its start goals.  Ruffin concedes that "it was just a bad choice of words that I used."  McTyer understands Ruffin had been given an order to "gut" her.  McTyer believes Ruffin discriminated against her in training because "that's what Mr. Rice wanted him to do" and Ruffin told her that Rice "had told him to gut me."  Rice testified that he never told Ruffin or any DOR to gut any employee.

Hobbs and Jefferson each resigned their ITT employment during March 2002 to work for one of ITT's competitors.  McTyer and Litvine were the only outside representatives after Hobbs and Jefferson resigned.  McTyer and Litvine were moved to inside representative positions effective April 1, 2002 because headquarter decided to eliminate the outside representative position.  Both

5

Litvine and McTyer received a $2,000 reduction in their annual pay when they moved to the inside representative position.  Litvine and McTyer were moved back to outside representative positions effective October 1, 2002 and their pay was increased by $2,000 per year.

McTyer received 100 or so leads for the June 2001 start.  She complains that her high schools were not assigned to her soon enough.  McTyer enrolled one student for the June 2001 start.  Rice informed the representatives by memorandum that high schools would be reassigned after ITT's June start.  McTyer and Jefferson were assigned their high schools shortly before Ruffin became DOR effective September 1, 2001.

Because McTyer and Jefferson began working at ITT during February, more than halfway through the high school year, Ruffin believes that it was more productive to reassign high schools after the end of the high school year for continuity purposes.  The only lead that McTyer can identify as being entitled to but not receiving is Terrance (LNU) who was interviewed by Cary Booth, an inside representative, when McTyer was away from the Marketing Department.  McTyer believes Booth should have tracked her down on ITT's campus rather than moving forward with the interview.  Ruffin said during an argument with McTyer at a red flag meeting that he had taken leads away from McTyer and assigned them to other representatives.  Exeter allowed only a limited amount of time to work a lead and then it automatically reassigned the lead.  The argument occurred after Exeter's implementation and Exeter's automatic lead reassigned was one subject of the argument.

Ruffin testified that he never fed any employee leads and did not manipulate information in the Exeter system including leads, enrollments and starts.  McTyer recalls only one student being

reassigned and that student was reassigned to Lakeya Tuck, an African-American female. McTyer also complained that Jefferson, an African-American male, received some of her leads.

Because ITT is on a quarter system, there are four "starts" during each calendar year. Although high school students apply and enroll throughout the calendar year, it is more likely that a high school student will start during the two quarters that follow a typical high school graduation – the June and September starts. Outside representatives must maintain a steady stream of high school students who apply and enroll throughout the year in order to meet their annual start goal.

McTyer received a Job Performance Warning Letter regarding her performance from September 10, 2001 to November 1, 2001. The position standard for an outside representative at McTyer's level was 1.2 students applied a week. McTyer applied only six students during a time period that she should have applied 15.6. McTyer lost no pay as a result of the letter of warning. McTyer is not aware of anyone who had a performance deficiency similar to hers and did not receive a letter of warning. McTyer was placed on probation effective February 2002 because of lack of production.

From September 2001 to February 20, 2002, McTyer only applied ten students or about one-half student per week whereas her position standard was 1.2 students per week. McTyer was not demoted and did not lose pay as a result of any write-up.

The 2001 warning letter and 2002 probation letter were based solely on McTyer's lack of performance. McTyer, Hobbs and Jefferson were the three least productive representatives supervised by Ruffin. Rice questioned Ruffin about the three employees' lack of production. Ruffin also gave Rowlen, white female, a letter of warning.

7

McTyer received an overall "4" rating ("Results Less Than Expected") on her 2001-2002 performance evaluation.  McTyer received 668 leads during 2001 but she had only three starts from September 2001 until February 2002 and a 33.3% show rate.  Although McTyer's annual start goal was 25 students, this goal was adjusted to 12 students and McTyer was only evaluated for her performance from September 2001 to February 2002, the time period that she was supervised by Ruffin rather than Reeves.  Ruffin gave McTyer a "4" rating even though she deserved a "5" (Results Not Acceptable) because she would not receive a raise with a "5."

McTyer does not know of any white employee during the 2001-2002 review period who had similar performance to her and received a better review.  McTyer received an overall "4" rating on her 2002-2003 performance appraisal for results less than expected.  Jesse Johnson, Ruffin's successor, rated McTyer for the 2002-2003 period.  Her review is based solely on her performance.

McTyer contends she had 24 starts for 2002-03 even though her review notes only 22.  She concedes that 24 starts was less than her goal of 25.  McTyer is not aware of any white employee during the 2002-2003 review period who had similar performance and received a better review.  McTyer received raises with the two evaluations about which she complains.

McTyer, Carrie Moore, Weena Jones, Meredith Rowlen and Lakeya Tuck met with Rice in late May or June 2002 to complain about comments allegedly made by Booth and Ruffin that they considered inappropriate.  Ruffin asked Carrie Moore in McTyer's presence if two could fit in her skirt; (2) informed the female representatives, including McTyer, that they would close more students if they wore shorter skirts; and (3) told McTyer and C. Moore that he would "sop them up like a biscuit."  Ruffin's comments were all made before June 2002 and the comments were made within one month of each other.

Cary Booth called Meredith Rowlen a lesbian.  Rice investigated the complaints and reported the allegations to ITT headquarters.  In June 2002 Lisa Cardona, ITT's Human Resources Manager responsible for the Birmingham campus traveled to Birmingham to investigate the allegations. Cardona met with McTyer, C. Moore, Jones, Rowlen, Tuck, other female employees as well as Ruffin and Booth on or about June 27, 2002.  Booth admitted making the lesbian comment and confirmed that he had apologized to the female employees during and/or immediately after the meeting during which the comment was made.  Booth was disciplined, required to attend sexual harassment training, and warned that future incidents could lead to termination.

Ruffin admitted making a "biscuit" comment but contends he was simply reciting lines from Richard Prior movies.  Ruffin was disciplined, required to complete an on-line professional development course in sexual harassment, and warned that future incidents of inappropriate behavior could lead to termination.  Ruffin began the on-line professional development course in sexual harassment but failed to complete it prior to the termination of his employment.  No further instances of alleged sexually inappropriate behavior allegedly attributable to Booth or Ruffin were reported to ITT.

Following the investigation, Rice met with the complaining female(s) and informed them that the matter had been investigated and handled; however, he did inform them of the specific personnel actions that had been taken.

McTyer admits that she missed some special events at ITT, such as phone-a-thons and meetings, but contends they were not mandatory and that she had permission not to attend.  ESI Work Guidelines provide:

> Any of the following offenses by an employee will result in the immediate termination of the employee's employment with ESI.
>
> 4.    Obscene, indecent or insubordinate behavior, including, without limitation, refusing or failing to follow instructions, performed assigned work or otherwise denying the authority of an ESI supervisor.

McTyer, Litvine and Carrie Moore missed a no-show meeting in July 2002.  McTyer contends she missed the meeting due to some misunderstanding.  McTyer failed to report to work as scheduled on March 31, 2003.  ITT's Attendance and Punctuality Policy provides:

> If, for any reason, you cannot arrive at work at the designated time, you must contact your supervisor before work or within the first hour of the workday.  Employees must call personally and speak directly with the supervisor.

McTyer did not call her supervisor directly to let him know that she would not report to work on March 31, 2003.  Rather, she left a message on a recorder even though she knew she was supposed to contact the DOR, Jesse Johnson, directly.  McTyer was warned that "continue[d]" unscheduled or unreported absent [sic] will result in further disciplinary action."

McTyer took her mother to the doctor on March 31, 2003.  McTyer was scheduled to work a phone-a-thon on April 23 or April 24, 2003.  According to McTyer, on the day that she was scheduled to work McTyer noticed that she would have over 40 hours that week since she was scheduled to go to Tuscaloosa that Saturday for a festival at a high school.  When she consulted with Johnson, he told her to go home because he did not want her to receive overtime.  McTyer left as Johnson instructed and worked the remainder of the week, including going to Tuscaloosa on that Saturday.  Johnson called McTyer into his office on Monday and asked her about the phone-a-thon.  McTyer reminded him of their conversation and Johnson said everything was fine.  McTyer was

brought into the office on a Thursday and was told by Rice and Johnson that she was terminated effective May 1, 2003, for missing the phone-a-thon, because the phone-a-thon was mandatory.

McTyer did not show up to work the phone-a-thon and she did not inform her team captain Weena Jones that she would not attend the phone-a-thon. According to Johnson, McTyer did not inform him that she would not attend the phone-a-thon and he did not give her permission not to attend. Johnson informed Rice that McTyer was scheduled to work the phone-a-thon; that she did not attend the phone-a-thon; and that she had neither asked to be excused from the phone-a-thon nor had she contacted him to inform him that she would not attend the phone-a-thon.

Rice relayed what Johnson told him to ITT Human Resources Manager Lisa Cardona and Regional Director John Hawthorne. McTyer's employment was terminated on May 1, 2003 because she did not attend the phone-a-thon after receiving several prior warnings, including the recent March 31st incident, for failing to report to work and/or failing to properly notify her supervisor when she would be off. Rice, with Hawthorne's approval and Cardona's assessment that termination was the action mandated by ITT policy, made the decision to terminate McTyer's employment based on McTyer's insubordinate conduct in failing to follow instructions and perform the work (i.e., phone-a-thon) assigned by Johnson, her African-American supervisor. Other than relaying his version of what had transpired to Rice, Johnson did not participate in the decision to terminate McTyer's employment.

McTyer is not aware of any ITT employee who did not show up for three mandatory events and who was not terminated. She admits that she did not attend the events she was supposed to attend. McTyer admits that she received at least two additional reprimands regarding other incidents

where she did not call her supervisor before she missed mandatory events (an orientation and an open house).

No other ITT employee at the Birmingham campus has missed a mandatory scheduled event (such as the phone-a-thon) without permission after multiple prior warnings and was not terminated.

*McDonnell Douglas* framework

Because McTyer attempts to prove her case with circumstantial evidence, the burdenshifting analysis established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973) is applicable.  Under this framework, McTyer has the initial burden of establishing a *prima facie* case of discrimination.  *Texas Dept. Of Community Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981); *Combs v. Plantation Patterns*, 106 F.3d 1519 (11th Cir. 1997), *cert. denied,* 522 U.S. 1045 (1998).  If she proves a *prima facie* case of discrimination, the burden shifts to ITT to rebut the presumption of discrimination by producing evidence of a legitimate, nondiscriminatory reason for its action; however, "the defendant need not persuade the court that it was actually motivated by the proffered reasons."  *Burdine*, 450 U.S. at 254.  Defendant's burden is "exceedingly light" *Meeks v. Computer Associates, Int'l*, 15 F.3d 1013, 1019 (11th Cir. 1994).  If the defendant carries this burden, the presumption of discrimination created by the *prima facie* case "drops from the case" and "the factual inquiry proceeds to a new level of specificity.  *Burdine*, 450 U.S. at 255, n. 10.  The burden then shifts to the plaintiff to present sufficient evidence, including evidence produced in support of the *prima facie* case "sufficient to permit a reasonable fact finder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision," but were merely pretext for intentional discrimination.  *Combs*, 106 F.3d at 1528 (citing *Burdine*, 450 U.S. at 256, *McDonnell Douglas*, 411 U.S. at 804).  "The ultimate burden of persuading the trier of fact that the

defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff. "
*Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 143 (2000).

I.  Failure to train, lead assignments, and write-ups

To establish a *prima facie* case of discrimination based on disparate treatment, McTyer much show that (1) she is a  member of a protected class, (2) she suffered an adverse employment action, and (3) similarly situated persons outside the protected class were treated more favorably.  *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1087 (11th Cir. 2004); *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997).  Assuming that a *prima facie* case is established, the court then looks to the remainder of the *McDonnell Douglas* framework.

A.      Failure to train

McTyer alleges that Reeves failed to adequately train her.  After McTyer and Jefferson complained about the training they received from Reeves, they were sent to ITT's Jacksonville, Florida campus for two and a half days of additional training.   McTyer and Jefferson were the only representatives hired while Reeves was DOR and the only representatives trained by Reeves. McTyer does not identify any person who was outside the protected class who was better trained by Reeves. Further, she testified that Reeves was incapable of training her because of his lack of knowledge. She admitted that the inadequate training by Reeves was not related to race.  To the extent that McTyer complains of inadequate training by Reeve, she cannot establish a  *prima facie* due to her failure to show that a similarly situated person outside the protected class was treated more favorably.  That is, she cannot show that a non-African American person trained by Reeves, received better training than she did.

"[A] comparator much be similarly situated 'in all relevant respects.'... The comparator must be nearly identical to the plaintiff to prevent courts from second-guessing a reasonable decision by the employer.  See *Silvera v. Orange County Sch. Bd.*, 244 F.3d 1253, 1259 (11th Cir. 2001)." *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079 (11th Cir. 2004), quoting *Turnes v. AmSouth Bank, N.A.*, 36 F.3d 1057, 1060 (11th Cir. 1994).

McTyer argues that Meredith Rowlen and Cary Booth were both adequately trained.  Rowlen and Booth, however, are not proper comparators as Rowlen was trained by Reeves's successor while Booth was trained by Reeves's predecessor. [1]

B.      Lead assignments

While plaintiff argues that there was clear evidence that Jerome Ruffin could and did manipulate the number to favor white employees, there is in fact no such evidence.  McTyer testified:

Q:      Okay.  Which leads you to believe that you were entitled to that you did not receive?

A:      I don't have any of that information.

Q:      Can you identify a single lead that you believe you were entitled to that you did not receive?

A:      There's one with – if I'm – the name Terrence Oakes or Terrence Clark.

---

[1]      ITT addressed McTyer's deposition testimony that Reeves's successor, Ruffin, also failed to adequately train her.  She stated that Ruffin simply reviewed training with her while spending a lot more time training Meredith Rowlen, white, and Lakeya Tuck, African American.  McTyer has not argued in the response brief that Ruffin failed to adequately train her.  This claim thus has been abandoned.  Moreover, the fact that not only Rowlen, white, but also Tuck, African American, were given better training than McTyer would negate that any difference in training was based on discrimination.  Ruffin is also African American.

By the time Rowlen was hired, McTyer had been employed at ITT for almost a year.  By the time Tuck was hired, McTyer had been employed at ITT well over a year.  While McTyer was not happy with the training that she had received by Reeves, she had also been trained at the Jacksonville ITT campus and had been working at the Birmingham campus for six months between the time she completed her training in Jacksonville and Ruffin replaced Reeves.  Thus, McTyer cannot show that the newly hired Rowlen and Tuck were similarly situated to her as she had already been through new employee training once.

14

. . . .

Q:      Where was Terrence from?

. . . .

A:      It was either Birmingham or Sylacauga.

Q:      What high school?

A:      I can't remember the name of the high school right off.  I would have that in my notes.

Q:      And who received this lead?

A:      Cary Booth

Q:      And why do you believe you were entitled to the lead over Cary Booth?

A:      I had the appointment made.  He came out to the appointment.  Mr. Booth did not receive – did not have a signed questionnaire on it.  And he conducted my interview.

Q:      And why didn't you conduct the interview?  Were you not there?

A:      Yes, I was there.  But I had stepped into another part of the school.  I had not – The receptionist was not there.  Nobody made me aware that he was there.  So he – Mr. Booth came up to the front and he took him into his office.

Q:      Okay.  So you don't know – Well, I think you've already testified that you were not at the – in the marketing department office at that time?

A:      That's correct.

Q:      Okay.

A:      But I had – We had to write our appointments on a board, so his name was under my name on our board.

Q:      Okay.

A:      So all he had to do, really, is look at the board and he would have known that it was mine, and he could have paged me.

Q:      Okay.  So he could have found you and had you come back to do the interview; correct?

15

A:     Right.

Q:     But he didn't do that?

A:     No, sir.

Q:     Okay.  Did you complain about that to anyone?

A:     Yes, sir.

Q:     Okay.  Who did you complain to?

A:     Mr. Ruffin.

Q:     And what did Mr. Ruffin say?

A:     He said that he would talk to him the next day.  So the next day, a questionnaire appeared with no signature, and – on a – and a blank sheet of paper with his name on it appeared.

Q:     With Terrence's name on it or with Cary Booth's name on it?

A:     Uh-huh.  Terrence was a high school student, so it should have been mine.

Q:     Okay.  So you should have worked the lead because you were working high school leads at that time?

A:     I had actually made the appointment, had called him out, he came on my appointment.

Q:     Okay.  Did Terrence eventually enroll in ITT?

A:     Yes.

Q:     Okay.  Did he complete a course of study at ITT?

A:     I don't think he's completed it yet.

Q:     Okay.  Was there any other way that you believe Cary Booth received favorable treatment over you in receiving leads, other than this Terrence incident?

A:     Well, one day we were having what is called a red flag meeting.

Q:     Okay.  What's a red flag meeting?

16

A:    That's where we discuss – They'll call out our enrollments, and then we'll discuss if we're having any problems, you know, where they are through the system, like financial aid, that type thing.

And Mr. Ruffin admitted in front of a roomful of people that he had manipulated the system, as far as I was concerned.

. . . .

Q:    Tell me exactly what Mr. Ruffin said.

A:    I had complained to him that he had been manipulating the system, as far as giving leads to me.

I'd also said that I had had – that he had extracted some of my conducts out of the system and rerouted them to other reps.

And when we were in the meeting, we had kind of gone back and forth and gotten into it. And then that's when he said that, yeah, he had taken about ten or twenty of tem from me, and that it was easy to do.  He had under the administrative – it was a screen, I guess, administrative screen, and that's how he did it.

Q:    Okay.  And you're talking about he manipulated Exciter?

A:    Yes.

. . . .

Q:    Let me just finish about this.

Now, you said these were ten or twenty conducts?

A:    He had –

Q:    Were they conducts or leads?

A:    Well, let me go back.  What he said was, that he had – he had also manipulated some of the questionnaires that I'd had, which would have been starts.

He did – He talked about leads – I mean, we were going at it about everything, leads, conducts, and starts, or potential conducts and starts.  You know, like when we would enroll – In the Exciter, you had so much time that you could –

Q:      Work a lead?

A:      –work a lead.

Q:      And if you didn't work the lead, it was transferred to somebody else?

A:      Exactly.

Q:      Okay.

A:      And so all of those came into play.

Q:      All right.  Well, who were these leads, conducts, or starts that he referred out to other reps?

A:      He didn't call any names, but I had been complaining all the while.  I know one was a Gabriel – I'd have to go through all of my notes, but I know one was a Gabriel.  She had actually showed up for orientation.

. . . .

Q:      And you were getting credit for Gabriel showing up for orientation?

A:      No.  It had already been rerouted.  But I always kept a log of, you know, people that I interviewed or whatever.  So she was – She was on my log, but it ended up being rerouted.

Q:      Okay.  Who was it rerouted to?

A:      At that particular time, that one ended up going to Lakeya.

(McTyer depo., pp.208-216).

Out of 10 or 20 leads that were allegedly manipulated, one went to Cary Booth, white,[2] and one went to Lakeya Tuck, African-American.  McTyer cannot identify any of the other leads that were allegedly manipulated.  Moreover, Ruffin has specifically denied manipulating Exeter.  The tenor of McTyer's account of the red flag meeting is that Ruffin "admitted" manipulation only as a result of exasperation from after he and McTyer had "gone back and forth and gotten into it."

---

[2]      While McTyer scheduled an interview with "Terrence," Booth conducted the interview in her absence.

18

McTyer has not proven a *prima facie* case of disparate treatment because she has not shown she was treated differently than similarly situated employees outside of the protected class as one of the alleged comparators was also African American.

### C. Write-ups and bad evaluations

In her brief in response to the motion for summary judgment McTyer argues "The bad evaluations were a result of the leads being taken away and the write-ups also contributed to the bad evaluations." Even if 10 to 20 leads were taken away, at best, this would translate into one or two "starts" as it generally takes 12 to 20 leads to "start" one student. One or two additional starts would not have changed McTyer's rating from a 4 to a 3. She has not identified any comparator who received more favorable treatment with respect to write-ups and evaluations; thus, she has failed to establish a *prima facie* case of disparate treatment.

### D. Pay

The only pay claim addressed by McTyer in her brief in response to the motion for summary judgment is the change in pay claim as a result of being moved from the outside representative to the inside representative. Any other pay claims are therefore abandoned. Both McTyer and Litvine, white, were moved from outside representative to inside representative positions and received a $2,000 reduction in annual pay. McTyer, however, complains that Litvine's pay was not immediately reduced.

In deposition McTyer testified:

Q:    Is it your understanding that both you and Mr. Litvine lost money as a result of moving from outside rep to inside rep?

A:    Yes.

Q:    And how much money did you and Mr. Litvine lose?

A:    Two thousand dollars.

Q:    A two thousand dollar reduction in your salary; is that correct?

A:    Correct.

Q:    Did Mr. Litvine tell you that he also received a two thousand dollar reduction in his salary?

A:    He told me that we were both supposed to get a two thousand dollar cut in salary.  Later on, he said he – I think there was some error, because I think he said that he didn't see it in the beginning, so I don't know.

Q:    Okay.  Do you have any reason to believe that he didn't get a two thousand dollar reduction in his salary?

A:    No.

(McTyer, pp.89-90).

In his affidavit Litvine testified that his annual salary was reduced by $2,000 when he was moved to the inside representative position.  Inasmuch as Litvine, her "comparator," also received the same $2,000 reduction in salary that McTyer received, she cannot establish a *prima facie* case of disparate treatment based on pay because she has failed to show a similarly situated person outside the protected class was treated more favorably.

As evidence of pretext, McTyer argues that there was direct evidence that Rice put up his DORs to taking adverse actions against black employees.  This appears to be a reference to Hobb's Hobbs's deposition testimony that Ruffin told Hobbs that he had been put up to running McTyer and Jefferson off.  Hobbs testified that after leaving ITT, he stopped by one day:

And he [Ruffin] apologized  to me for some of the things that transpired there, and told me that he was made to do some of the things that happened there.

Q.    That he was directed to do those things by his supervisor?

20

A.    That's correct.

Q.    And what things were those?

A.    Well, just make things just, you know, basically hard, you know, for us.  Meet compliance with, I guess, the regulations there.  Just having some of the things that went on, as far as the job was concerned, and things of that nature.

Q.    Mr. Ruffin didn't tell you that he was told to do that because you were black; correct?

A.    Not to my knowledge.

....

A.    Like I said, I was in the neighborhood that particular evening I decided to stop by.  And that's when Mr. Ruffin came and told me that. ... [H]e apologized to me for what went on after I left, and that he was wrong, and that that was the reason – that's why he did it, because he was instructed to do so.

That he tried to make it hard for Barry and Kimberly to get fired, and just hope I would leave.

(Hobbs depo., 310-14).

Ruffin testified that Rice did not tell him that he wanted him to watch any certain employees

more closely than others but that Rice did question him about employees whose production was low,

i.e. Hobbs, McTyer and Jefferson.   (Ruffin depo., 73).

Ruffin testified:

Q.    Did you ever tell any of the Plaintiffs in this lawsuit that Mr. Rice had – had put you up to taking any actions against them at ITT because of their filing their – this lawsuit or complaining about discrimination or any – or filing their EEOC charges?

A.    Yes, I did.  After I was terminated?  Yes, I did because everything came to light.

....

Q.    What did you say?

A.    I was saying, you know, they used me to get rid of Stephen Hobbs and Barry Jefferson, who was the major complainers.  And now that they're done with them, now he's done with me.  That's just how I felt.

Q.      How do you feel they used you to get rid of Mr. Hobbs and Mr. Jefferson?

A.      Because again they felt it was a racial – they felt it's a racial problem that they had at the school, and this is starting back before I even came to ITT Tech.  And they said that – that Mr. – they felt that Mr. Rice was using me to ease the problem down on the earlier incident we was talking about with Benny Reeves and get the heat off of him.

                                        ....

Q.      Did anyone ever tell you to treat Barry Jefferson differently because of his race?

A.      No, sir.

Q.      Did anyone ever tell you to treat Barry Jefferson differently because he might have complained about race discrimination?

A.      No, sir.

Q.      Did anyone ever tell you to treat Stephen Hobbs differently because of his race?

A.      No, sir.

Q.      And did anyone ever tell you to treat Mr. Hobbs differently because he'd complained about race discrimination?

A.      No, sir.

Q.      Did anyone ever tell you to treat Kimberly McTyer differently because of her  race?

A.      No, sir.

Q.      Did anyone ever tell you to treat Ms. McTyer differently because she'd complained about race discrimination?

A.      No, sir.

Q.      Or ever tell you to keep a paper trail on any of your employees?

A.      No, sir.  But as the – the way the system works, you have to let the employee know where he or she stands, especially with production.  So if there's a lack of production, you have to formally let them know hey, this is where you're at now; this is where you need to be; and that starts with the letter of caution.  Then the letter of warning, then the letter of perf – of probation.

                                        22

....

Q.    Did anyone ever tell you take action against any of the  – any of the Plaintiffs because they complained of race discrimination?

A.    No, sir.

....

Q.    And – so do you believe that Mr. Rice put you up to taking some action against any of these Plaintiffs because they complained about race discrimination?

A.    No.

(Ruffin depo, 84-85, 120-21, 128-29).

A fair reading of the testimony of Hobbs and Ruffin does not support McTyer's conclusion that Rice "had a vendetta" against black ITT employees and put his DOR up to taking adverse actions against the black employees.  McTyer argues that there is further evidence of pretext based on Reeves's demotion rather than termination after it was discovered he had forged documents regarding McTyer's training.  This is not evidence that ITT did not care that McTyer was not adequately trained.  Further, the fact that McTyer was one of only two Birmingham ITT representatives ever sent to another ITT facility for training indicates great concern to see that she was adequately trained.

II.  Hostile Work Environment Claim

In order to establish a *prima facie* case of a sexually hostile work environment, a plaintiff must show:

(1)    that she belongs to a protected group;

(2)    that she has been subject to unwelcome harassment;

(3)    that the harassment must have been based on a protected characteristic of the employee, such as [sex];

23

(4)     that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and

(5)     that the employer is responsible for such environment under either a theory of vicarious or of direct liability.

*Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002); *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245 (11th Cir. 1999), *cert. denied,* 529 U.S. 1068 (2000).

ITT argues that McTyer cannot show the fourth element – that the work environment was "permeated with 'discriminatory intimidation, ridicule and insult' that was 'sufficiently severe or perverse to alter the conditions of the victim's employment and create an abusive work environment." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993).

Plaintiff identified two comments by Ruffin that she alleges constitute sexual harassment – one comment directed to her, the biscuit comment, and one comment directed to her as one in a group of women, the short skirt comment.  She also identifies the comment of Booth directed to another woman accusing her [not McTyer] and a third woman [not McTyer] of being lesbians.[3/]  The requirement that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment has both an objective and subjective component.  *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21-22 (1993).   While McTyer may have subjectively perceived the environment to be abusive, she has failed to present evidence that would allow this court to find that  a reasonable

---

[3/]     McTyer refers in her brief to sexual comments that were directed to other plaintiffs and to incidents that Rice testified to.  There is no evidence that she was aware of the other comments and incidents and such incidents cannot be considered in considering either the objective or subjective components.

person would find the environment to be hostile or abusive.  In reviewing the objective component, the court should look at four factors: (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance.  *Mendoza*, 195 F.3d at 1246.  There were only three comments witnessed by or directed to McTyer.  The conduct was not severe inasmuch as it was not accompanied by gestures, touching or extreme vulgarity.  The comments were not physically threatening nor humiliating but rather merely offensive utterances.  Finally, the comments did not unreasonably interfere with McTyer's job performance.  The harassment was not sufficiently severe or pervasive to alter the terms and conditions of employment.

Retaliation claim

To establish a *prima facie* case for retaliation, McTyer must show that "(1) [s]he engaged in protected activity; (2) [s]he suffered an adverse employment action; and (3) there was a causal link between h[er] protected activity and the adverse employment action."  *Bass v. Bd. of County Comm'rs, Orange County, Fla.*, 256 F.3d 1095, 1117 (11th Cir. 2001).

ITT argues that McTyer cannot show a *prima facie* case of retaliation because she failed to show that she suffered an adverse employment action and that there was a causal link between the protected activity and the adverse employment action.  McTyer argues that the taking away of leads, bad write-ups, bad evaluations and being moved from outside rep to inside rep all occurred after complaints of race discrimination, sexual harassment and the filing of an EEOC charge.

McTyer testified that she believed her 2001-02 and 2002-03 reviews were in retaliation for her complaints because she could not meet her "starts" goals.  (McTyer, p.362).

Rice testified by affidavit that evaluation goals for ITT employees are set by ITT Headquarters.  McTyer failed to present evidence to establish the person setting her goals was aware of her protected activity; therefore, proximity was not enough to establish a *prima facie* case of retaliation.  *Brungart v. BellSouth Telecommunications, Inc.*, 231 F.3d 791 (11th Cir. 2000), *cert. denied,* 532 U.S. 1037 (2001).

Moreover, McTyer cannot show a *prima facie* case of retaliation based on her move from outside representative to inside representative in light of the fact that the only other outside representative, Litvine, was moved to an inside position at the same time as McTyer and there is no allegation or indication that Litvine had participated in protected activity immediately prior to the move.

ITT argues that its actions regarding McTyer were legitimate, non-discriminatory business reasons.  Specifically, ITT argues that McTyer received her leads based on high school assignment, through ITT's Exeter computer system and possibly through random assignment.  ITT argues that her evaluations reflected her poor performance based on her starts vs. her goal.  ITT also that the write-ups (the 2001 warning letter and the 2002 probation letter) were production based.

McTyer argues that these reasons were pretext for discrimination and relies on Hobb's deposition testimony and Ruffin's alleged statement that he had been ordered to gut McTyer which have been previously discussed and rejected as evidence of pretext.

Termination claim

ITT argues that McTyer cannot establish a *prima facie* case of racial discrimination based on termination because she cannot show that a similarly situated person outside her protected class

who engaged in nearly identical conduct and was not similarly disciplined.  She has made no attempt in her responsive brief to identify such a similarly situated person.

ITT further argues that McTyer cannot establish a *prima facie* case of retaliation based on termination because she cannot establish causal connection between the participation in the protected activity and the adverse decision.  There is insufficient proximity between the EEOC charge of June 13, 2002 and McTyer's May 1, 2003 termination more than ten months later.

> mere temporal proximity but has stated that knowledge of protected activity and an adverse
> ... action ... must be 'very close.'" *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268,
> 273, 121 S.Ct. 1508, 1511, 149 L.Ed.2d 509 (2001) (citations omitted).  The Court
> cited with approval decisions in which a three to four month disparity was found to
> be insufficient to show causal connection.  *See id.* (citing *Richmond v. ONEOK*, 120
> F.3d 205, 209 (10th Cir. 1997) (3-month period insufficient) and *Hughes v.
> Derwinski*, 967 F.2d 1168, 1174-75 (7th Cir. 1992) (4-month period insufficient)).

*Higdon v. Jackson*, 393 F.3d 1211, 1220 (11th Cir. 2004).

McTyer's termination on May 1, 2003 followed the filing of this lawsuit by just over one month.   Even assuming a *prima facie* case of retaliation, ITT has offered a legitimate nondiscriminatory reason for her termination.  ITT argues that McTyer was terminated because she did not work as scheduled.

As evidence of pretext, McTyer relies upon the alleged comment by Ruffin that he had been ordered to gut her and had been sent to get rid of her.  Having already been rejected, this "evidence" does not warrant further discussion.  Proximity of the filing of this lawsuit to her termination is insufficient to establish pretext.  *Barnes v. Crowne Investments, Inc.*, 2005 W.L. 1155673 (S.D. Ala. 2005).  *Padron v. BellSouth Telecommunications, Inc.*, 196 F.Supp.2d 1250 (S.D. Fla. 2002), *aff'd*, 62 Fed. Appx. 317 (11th Cir. 2003).  *Combs* clearly envisions that proximity must be accompanied by additional or "sufficient" evidence to support a finding of pretext.

Finally, McTyer argues as evidence of pretext that she had her supervisor's permission not to attend the phone-a-thon.  Her supervisor, however, testified that he did not give her permission to miss the phone-a-thon and that he reported her absence to Rice who then reported her conduct to headquarters.  Rice, in consultation with headquarters, not Johnson, made the decision to terminate McTyer's employment with ITT for failing to attend the phone-a-thon.

"An employer who fires an employee under the mistaken but honest impression that the employee violated a work rule is not liable for discriminatory conduct."  *Damon v. Fleming Supermarkets of Florida, Inc.*, 196 F.3d 1354, 1363 n.3 (11th Cir. 1999), *cert. denied,* 529 U.S. 1109 (2000).  See also *Sempier v. Johnson and Higgins*, 45 F.3d 724, 731 (3d Cir. 1995) ("pretext is not demonstrated by showing simply that the employer was mistaken."), *cert. denied,* 515 U.S. 1159 (1995).  McTyer has not presented evidence that ITT did not rely on Johnson's report or that ITT knew Johnson's report to be false.  She has therefore failed to present sufficient evidence to permit a reasonable fact finder to conclude that the reason given by ITT was not the real reason for her termination.

Based on the foregoing, ITT's Motion for Summary Judgment (doc. #27) is due to be granted.  A separate final judgment consistent with this memorandum of opinion will be entered simultaneously herewith.

As to the foregoing it is SO ORDERED this the 20th day of September, 2005.

_____
PAUL W. GREENE
CHIEF MAGISTRATE JUDGE